UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RAYMOND  JOSEPH  AUDLER                    CIVIL ACTION

VERSUS                                     NUMBER: 12-2883

CAROLYN W. COLVIN, ACTING                  SECTION: "E"(5)
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION

## REPORT  AND  RECOMMENDATION

Pursuant  to  28  U.S.C.  §636(b)  and  Local  Rule  73.2(B),  this
matter  comes  before  the  Court  on  the  parties'  cross-motions  for
summary  judgment  following  a  decision  of  the  Commissioner  of  the
Social  Security  Administration  denying  plaintiff's  application  for
Disability  Insurance  Benefits  ("DIB").   (Rec. docs. 26, 27).

Raymond  Joseph  Audler,  plaintiff  herein,  filed  the  subject
application  for  DIB  on  August  26,  2010,  with  a  protective  filing
date  of  August  12,  2010,  alleging  disability  as  of  March  29,  2010.
(Tr. pp. 139-145, 161-162).   In a "Disability Report" that appears
in  the  record,  the  conditions  resulting  in  plaintiff's  inability  to
work  were  identified  as  a  back/neck  injury,  two  ruptured/bulging
discs  in  the  lower  back,  knee  issues,  and  a  neck  fusion.   (Tr. pp.

163-168).   Plaintiff's application for DIB was denied at the initial level of the Commissioner's administrative review process on or about September 23, 2010.   (Tr. pp. 85, 86-92, 93-96). Pursuant to plaintiff's request, a hearing *de novo* before an Administrative Law Judge ("ALJ") went forward on July 27, 2011 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified.   (Tr. pp. 99-100, 37-84).   On August 25, 2011, the ALJ issued a written decision in which she concluded that plaintiff was not disabled within the meaning of the Social Security Act.   (Tr. 22-36).   The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision on August 22, 2012, thus making the ALJ's decision the final decision of the Commissioner.   (Tr. pp. 6-9).   It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In his cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

 (1) [w]hether the ALJ erred in finding that Plaintiff's cervical impairments are not of listing level severity.

 (2) [w]hether the ALJ erred in finding [that] Plaintiff's mental impairments were not severe.

 (3) [w]hether the ALJ's RFC finding is supported by substantial evidence or results from legal error, and whether the error(s) result in prejudice to Plaintiff.

(Rec. doc. 26-2,  p. 2).

2

Relevant to the issues to be decided by the Court are the following findings that were made by the ALJ:

1.   [t]he claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.   [t]he claimant has not engaged in substantial gainful activity since March 29, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.   [t]he claimant has the following severe impairments: Disorders of the Cervical and Lumbar Spine; and Degenerative Joint Disease of the Knees (20 CFR 404.1520(c)).  These are severe impairments within the meaning of *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985) and the Regulations.

4.   [t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can never climb ladders, ropes or scaffolds.  He can perform no over head reaching.

6.   [t]he claimant is capable of performing past relevant work as a customer complaint clerk.  This work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.   [t]he claimant has not been under a disability, as defined in the Social Security Act, from March 29, 2010, through the date of this decision (20 CFR 404.1520(f)).

(Tr. pp. 27, 28, 29, 32).

Judicial review of the Commissioner's decision to deny DIB is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's

decision, and (2) whether the decision comports with relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983).  The Court may not reweigh the evidence or try the issues *de novo*, nor may it substitute its judgment for that of the Commissioner. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts. *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB bears the burden of proving that he is disabled within the meaning of the Social Security Act. *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as the "inability to engage in any substantial gainful activity by

4

reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. *Harrell*, 862 F.2d at 475. In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §404.1520, as follows:

> 1. an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.
>
> 2. an individual who does not have a "severe impairment" will not be found to be disabled.
>
> 3. an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.
>
> 4. if an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made.
>
> 5. if an individual's impairment precludes him from performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that

he has done in the past.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987).  In determining whether a claimant is capable of performing the work that he has done in the past, the ALJ is required to assess the demands of the prior work and to compare those demands to the claimant's present capabilities. *Villa*, 895 F.2d at 1022; *Hollis v. Bowen*, 837 F.2d 1378, 1386 (5th Cir. 1988); *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980). The assessment of the demands of the claimant's prior work "... may rest on descriptions of past work as actually performed or as generally performed in the national economy." *Villa*, 895 F.2d at 1022 (citing *Jones v. Bowen*, 829 F.2d 524, 527 n.2 (5th Cir. 1987)). A finding that the claimant is disabled or is not disabled at any point in the five-step review process is conclusive and terminates the Commissioner's analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

The medical records that were generated during the relevant time period[1]/ begin with a clinic note documenting plaintiff's visit to Dr. James Butler of Southern Spine Care on October 7,

---

[1]/ Under 20 C.F.R. §404.1512(d), the Commissioner is required to develop the medical history of a DIB claimant for at least twelve months prior to the month in which the application for benefits was filed unless there is reason to believe that development of an earlier time period is necessary.  As plaintiff protectively filed his application for DIB on August 12, 2010 and alleged an onset date of March 29, 2010, the relevant time period thus begins in July of 2009.

2009.  At that time, plaintiff was returning for reassessment, still suffering from some back and right knee pain.  However, his back was said to be doing well.  Upon physical examination of the knee, there was some tibia vara, tenderness over the medial joint-line, and a weakly positive McMurray's test but no effusion or instability.  X-rays of the knee were negative.  Plaintiff was given a prescription for a right knee brace and deferred undergoing an MRI at the time.  (Tr. pp. 234-235, 248, 293).

On December 16, 2009, plaintiff was seen by Dr. Michael Fischer whose treatment note is unfortunately not a model of clarity.  Plaintiff was experiencing arm and neck pain at the time and recalled a history of disc disease and C4-5 surgery in 1998.  Nevertheless, sensation, motor tone and strength, and gait were all within normal limits.  Further testing was recommended.  (Tr. pp. 224-225).  On December 23, 2009, plaintiff underwent an MRI of the cervical spine without contrast with reasons for the testing being identified as neck pain and headaches and weakness in the hands.  The impressions were:  status post anterior cervical fusion at the C5-6 level; slight diffuse posterior bulging of the C2-3 intervertebral disc; severe degeneration of the C4-5 intervertebral disc with diffuse broad-based posterior disc bulging versus disc protrusion and mild to moderate spinal canal stenosis; and, diffuse bulging of the C6-7 intervertebral disc.  (Tr. pp. 291-292).

7

Plaintiff returned to Dr. Butler on January 4, 2010, complaining of a recent onset of left knee pain that was of more concern to him as he was thinking about retiring from work. Physical examination revealed patellofemoral crepitance in both knees and tenderness without effusion.  MRI's of the knees were scheduled and plaintiff was prescribed Vicodin for pain relief. (Tr. pp. 232-233).  Plaintiff was seen again by Dr. Fischer the following day but his clinic note from that date is difficult to decipher.  What can be discerned is that plaintiff's muscle strength, gait, and station were within normal limits and that the impression included degenerative disc disease ("DDD")/degenerative joint disease ("DJD").  (Tr. p. 223).

On January 6, 2010, plaintiff underwent MRI studies of the knees.  Those of the left knee revealed chondromalacia patellae involving both the medial and lateral patella facets; small foci of marrow edema involving the medial femoral condyle and medial tibial plateau; and, minimal joint effusion but the menisci and ligaments were intact with no internal derangement.  Studies of the right knee demonstrated a degenerative change of the posterior horn and body of the lateral meniscus; abnormal subchondral bone marrow changes involving the lateral tibial plateau and anterior medial femoral condyle, non-specific findings which were likely degenerative or post-traumatic and related to repetitive stress;

8

and, chondromalacia patellae involving the medial patella facet. (Tr. pp. 243, 245-46, 289-290).

On January 13, 2010, plaintiff was given prescriptions for Valium and Halcion by Dr. James Denney. (Tr. p. 269). Plaintiff returned to Dr. Butler on March 8, 2010 with chronic complaints of bilateral knee pain secondary to osteoarthritis. Upon physical examination, both knees showed crepitance and limitation of motion but no effusion. Range of motion and flexion was limited secondary to pain. The impression was symptomatic osteoarthritis to both knees. Plaintiff was given injections of a steroid/xylocaine mixture, was prescribed Vicodin for severe pain, and was to return in three months or as needed. (Tr. pp. 230-231). Plaintiff was given a prescription for Serzone by Dr. Denney on July 13, 2010. (Tr. p. 269).

On September 1, 2010, plaintiff completed the Administration's form denominated "Function Report-Adult" which elicited information about how his conditions limited his activities. There, plaintiff indicated that his job as a service technician required a great deal of physical activity, eight to ten-hour workdays six to seven days per week, and that previous injuries, surgery, and age had limited his ability to meet the job's demands. A typical day consisted of rising, tending to his personal needs, feeding his pets, meditating, taking the dog for a short walk, cleaning, doing

repairs, watching TV, and gardening.  Plaintiff had no problem with
personal care, was able to prepare meals although his domestic
partner did most of the cooking, and could do household cleaning,
laundry, repairs, and mow the lawn.  Transportation was
accomplished by walking, driving and riding in a car, and riding a
bicycle.  Plaintiff could shop and handle finances and hobbies
included gardening, movies, watching television, and reading.
Socializing with family members was largely done over the phone.
Plaintiff estimated that he could lift ten pounds but standing was
difficult after squatting and reaching was problematic as
plaintiff's hands were quick to release.  He was very stiff after
rising from a sitting position and stair climbing was limited and
resulted in pain and stiffness.  Nevertheless, plaintiff believed
that his stamina was good if his knee or back did not act up and he
used a brace as needed.  Stress made plaintiff anxious, he felt
that he was becoming more agoraphobic, and his self-esteem was low.
(Tr. pp. 169-179).

On September 21, 2010, plaintiff underwent a consultative
evaluation at the hands of Dr. Felix Rabito.  Plaintiff reported
having worked for the AT&T Telephone Company for the previous
thirty-two years, going on disability status in March of 2010 and
being declared "surplus" due to his permanent medical restrictions.
His present status was in the Partnership Job Bank which allowed

him to receive biweekly payments from AT&T's termination allowance as a non-working employee and his termination date was identified as January 29, 2010.

Plaintiff's complaints at the time of the evaluation were neck, shoulder, hand, and low back pain with a history of cervical fusion surgery at C5-6 and resulting symptomatic improvement. However, the December 23, 2009 MRI showed evidence of multilevel cervical disc disease with severe degenerative changes at C4-5 and broad-based disc bulging. Less significant changes were present at C2-3 but changes were more significant at C4-5. An MRI of the brain was reportedly performed in December of 2009 which was within normal limits. Nerve conduction studies and electromyography had also reportedly been done that month which revealed no significant neurologic changes other than neuropathy at the right elbow. Plaintiff also recalled receiving intra-articular injections to the right knee in March of 2010 and the presence of symptoms that made it difficult for him to work full time. Otherwise, plaintiff denied any other significant medical history and he was open to returning to work if suitable employment could be found which matched his job skills. Plaintiff reported that his current activities were limited to mild household chores and light outside activities such as grass cutting and "grooming". Medications at the time included Vicodin, Naproxen, and Avacore.

11

Upon physical examination, there was no gross joint deformity and no heat or effusion present in either knee. Flexion of the knees was full and straight leg raising to 80 degrees produced no radicular pain. Plaintiff had normal muscle tone, development, range of motion, and strength in the upper extremities and there was no muscle atrophy or fasciculations. Handgrip was firm bilaterally and reflexes and cranial nerves were intact. Examination of plaintiff's back revealed a normal lordotic curve with no significant scoliosis. Flexion was possible to 90 degrees with no pain, there was no evidence of sciatica, and plaintiff was able to heel-to-toe walk.

Dr. Rabito's diagnosis was a history of multilevel cervical disease, postoperative status C4-5 interbody fusion in 1998, and a history of degenerative arthritis in the right knee. In commenting on plaintiff's status, the doctor noted that plaintiff "presented with no acute problems at the time" and that "[h]is general physical examination was essentially within normal limits." There were no significant motor, gait, or abnormal clinical neurologic findings evident and plaintiff presented with no significant affective symptoms and reported a willingness to work if suitable employment could be found. In Dr. Rabito's opinion, plaintiff appeared to be capable of normal ambulatory activity which did not require long periods of strenuous and repetitive use of his arms,

hands, and lower extremities.  A psychiatric evaluation was thought to be useful to rule out an affective disorder but plaintiff's affect and mental status at the time of the evaluation appeared to be normal.  (Tr. pp. 251-254).

Plaintiff returned to Dr. Butler on December 1, 2010 for a reassessment of his neck pain.  He complained of right hand numbness as well as some numbness to the right side of the facial area which appeared to be new.  He also complained of frequent headaches.  Pain was managed with Vicodin and Naproxen as needed which was an effective regimen.  On physical examination, pain was elicited with motion of the cervical spine, increased with flexion/extension.  The motor exam was normal, reflexes were +2 bilaterally, and distal pulses were intact.  X-rays of the cervical spine showed "some" degeneration.  Dr. Butler recommended an MRI of plaintiff's cervical spine in light of his stenosis-type complaints and ongoing neck pain for greater than six weeks.  The prescription for Vicodin was refilled and plaintiff was to return in four weeks for reassessment and follow-up.  (Tr. pp. 287-288).  On that same date, plaintiff completed a "Beck Test" questionnaire under the auspices of Dr. Denney.  Answers to the questions were indicative of feelings of sadness, failure, dissatisfaction/boredom, guilt, disappointment, self-criticism, suicidal thoughts with no plan, irritability, a loss of interest in others, poor decisionmaking,

lack of self-esteem, sleeping difficulties, fatigue, a pre-occupation with his physical problems, and a diminished interest in sex. (Tr. pp. 270-272).

On December 3, 2010, plaintiff underwent an MRI of the cervical spine which revealed status post anterior cervical fusion at the C5-6 level; degenerative disc disease at C4-5 and C6-7 with disc bulging and borderline spinal canal stenosis at the C4-5 level; and, additional disc bulges at the C7-T1, T1-2, and T2-3 levels. (Tr. p. 286). The MRI findings were relayed to plaintiff via telephone on December 14, 2010. Treatment options were physical therapy and epidural steroid injections ("ESI") to the cervical spine. Plaintiff's prescription was refilled. (Tr. p. 285).

Plaintiff was seen again by Dr. Butler on December 29, 2010 and he expressed a desire to defer physical therapy until after he had received an ESI. In addition to cervical pain, plaintiff also complained of bilateral knee pain, increased with flexion/extension. Physical examination results included crepitance with motion of the knees and increased amounts of pain with flexion beyond 120 degrees. Medial and lateral jointline tenderness was elicited bilaterally but the McMurray's sign was negative bilaterally. Plaintiff's cervical spine was tender to palpation along the cervical spine and paraspinous region. The

14

recent MRI results were once again reviewed. Dr. Butler's impressions were degenerative disc disease at C4-5 and C6-7 and osteoarthritis in both knees. Plaintiff was given steroid/ xylocaine injections in the knees and was referred to Dr. Francis for interlaminar injections at C4-5 and C6-7. (Tr. pp. 283-284). An injection at the C5-6 level was administered by Dr. Francis on January 3, 2011 without complications. (Tr. p. 282).

Plaintiff returned to Dr. Denney for psychiatric evaluation on January 13, 2011 after a hiatus since a previous visit on November 30, 2007. He reported being lonely and depressed since October of 2010, not having worked for about a year, and feeling adrift both emotionally and socially. Insomnia was complained of as were panic symptoms in the form of anxiety. Affective symptoms included a depressed/dysphoric mood, moving about or thinking slowly, indecision, feelings of failure and sadness, low general interest, moderate anhedonia, and isolation. His medication at the time was Serzone. On mental status examination, plaintiff presented as an anxious, dysphoric young male with a dysphoric, depressed, and anxious mood and a slightly flat affect. The diagnosis was as follows: Axis I - generalized anxiety disorder; Axis II - none; and, Axis III - back and neck pain. Plaintiff was maintained on Serzone and Valium. (Tr. pp. 264-266).

On February 10, 2011, plaintiff was seen again by Dr. Denny

15

for follow-up care.  He was said to be easily irritated and still feeling adrift but his affect was okay and his thoughts were goal-directed.  Plaintiff was continued on his medication regimen of Serzone, Valium, and Halcion.  (Tr. pp. 263, 267-268).  He was next seen by Dr. Butler on February 18, 2011 and reported doing some exercises at home although he still had some popping and clicking in his knees.  Plaintiff's main complaint at the time was neck pain which had improved 90% with the ESI.   Cervical examination demonstrated some mild tenderness in both trapezius muscles without spasm.   Range of motion was mildly restricted, the Spurling maneuver was negative, and a motor exam was normal.   Both knees showed patellofemoral crepitance but with no effusion and a full range of motion.  The impressions were:  1) cervical degenerative disc disease above and below plaintiff's earlier cervical fusion; 2) status post cervical fusion; and, 3) chondromalacia, both knees. Plaintiff was to consider having Supartz injections to both knees and his neck was to be observed with periodic injections to that site being a possibility.   Plaintiff was given a further prescription for Vicodin.  (Tr. 280-281).

The final piece of documentary evidence that was admitted in the administrative proceedings held below is a standardized form denominated "Medical Source Statement of Ability to do Work-Related Activities (Mental)" that was completed by Dr. Denny on March 10,

16

2011. There, the doctor checked off the appropriate boxes on the form to indicate that plaintiff had moderate limitations in understanding, remembering, and carrying out simple instructions and had extreme limitations in understanding, remembering, and carrying out detailed instructions and in making judgments on simple work-related decisions, further noting that plaintiff suffered from chronic pain which could interfere with some of the instructions he is given. Plaintiff also reportedly had slight restrictions in interacting appropriately with the public, supervisors, and co-workers and marked restrictions in responding appropriately to work pressures in a usual work setting and to changes in a routine work setting. He was believed to suffer from severe anxiety that would increase significantly if he was subjected to work changes or pressure. Dr. Denney further indicated that lifting/carrying would intensify the pain in plaintiff's neck/back and that he would miss an unspecified amount of work due to anxiety/pain. Plaintiff was, however, able to manage benefits in his own best interest. (Tr. pp. 276-277).

As noted earlier, a hearing before an ALJ went forward on July 27, 2011. After the documentary exhibits were admitted into evidence, plaintiff's attorney gave an opening statement, first explaining that the significant earnings that were reported in 2010 were due to plaintiff's receipt of payments from a form of a

severance package with his last day of work being March 28, 2010. Plaintiff, who was fifty-nine years of age at the time of the hearing, had worked for AT&T for thirty-two years, primarily as a service technician.  As a result of an injury that he sustained in 1996, plaintiff was tried in three other positions in an attempt to accommodate his physical limitations and at some point subsequent to 2006, he attempted to return to his normal job but was eventually unable to withstand its rigors.  Counsel then turned to the medical records from Dr. Butler which documented plaintiff's previous fusion, degenerative disc disease, chondromalacia, osteoarthritis in the knees, cervical radiculopathy, and frequent headaches.  Plaintiff also treated with Dr. Denney for a depressive order, not otherwise specified, and anxiety and the limitations that the doctor had noted on March 10, 2011, so argued counsel, would preclude the performance of substantial gainful activity. (Tr. pp. 39-43).

Plaintiff then took the stand and was questioned by the ALJ, providing information on his personal life including a BA in human resource management that he had obtained in 1996.  Plaintiff stood at 5'2" in height and weighed 135 pounds.  He testified to occasionally dropping items with his right hand and to experiencing pain radiating from his shoulders into his arms, making it difficult for him to reach overhead and move objects.  Plaintiff's

last day of work had been March 28, 2010 but he was maintained at full salary until January 29, 2011 under the company's severance package program.  At that time, he was officially terminated from employment even though he was undergoing physical therapy for his neck which was improving and he subsequently received the remainder of his severance pay, approximately $40,000.00, in February of 2011.  Until his workplace injury in 1996, plaintiff had functioned as a service technician in which he was required to go to work sites, climb poles, and do hard repairs.  After filing a claim for workers' compensation benefits, plaintiff underwent neck surgery followed by a lengthy recuperation period.  Upon returning to AT&T, plaintiff was allowed to function at the local work center for a short period of time, following which he was given a more permanent job in Georgia in the Trouble Resolution Group.  The latter job lasted for approximately one year and plaintiff was then transferred to New Orleans to work in the Circuit Provisioning Group which had little training associated with it and was thus very frustrating.  That lasted for two to two and one-half years when plaintiff began training to upgrade to a better paying position as a testing technician which he did until September of 2006.  After a number of deaths in the family and other personal issues, plaintiff returned to New Orleans and assumed the service technician position he once had until his departure from the

company in March of 2010 when the work simply became too physically taxing.  Less demanding indoor jobs were either unavailable or plaintiff did not possess the requisite skills to fill them.  (Tr. pp. 44-59).

In terms of physical capabilities, plaintiff estimated that he could walk for close to a quarter mile without stopping and that standing posed fewer problems if he could move around but was typically limited to no more than forty-five minutes.  He was able to lift and carry his dog which weighed eight pounds as well as groceries after going shopping.  As the hearing was in progress, plaintiff was experiencing pain in his lower back which he estimated to be at a level of "4".  Sitting was limited to fifteen to twenty minutes at a time.  Plaintiff spent an average of forty-five minutes per day on the computer.  Other daily activities included yardwork like raking and mowing, gardening, cooking, and routine household chores.  Social activities were becoming more limited as plaintiff tended to be more reclusive.  Plaintiff related his treatment history with Dr. Denney for anxiety, depression, and sleep issues for which he was on three different medications which he took more or less separately from one another. Although Serzone was helpful in controlling plaintiff's depression, it also caused vertigo.  Connections with family and friends were also waning.  Plaintiff's appetite was normal but his energy level

20

fluctuated and his concentration was sporadic.  In terms of transitioning to alternative employment, plaintiff was primarily concerned with the sufficiency of training, a lack of computer skills, and punctuality requirements.  Plaintiff was on the eve of receiving pension benefits and he was also a participant in a 401(k) benefit plan.  (Tr. pp. 59-70).

After being tendered to his attorney for further questioning, plaintiff testified that he never actually functioned in the customer service position while he was at AT&T nor was he fully versed in the testing tech job.  The trouble resolution position, however, was a bit more accommodating and allowed for breaks during which plaintiff could get up and walk around.  Typing was challenging for plaintiff due to problems with his hands. Plaintiff further testified that upon his return to the service technician job in 2006, he suffered from progressively worsening pain to his back.  Although he could still do some yardwork, he would be in severe shoulder and neck pain the following day for which he would take a Vicodin and a day of rest with alternating periods of lying down, use of a heating pad, and possibly soaking in the hot tub.  Such days of rest occurred on an average of three times per week.  Plaintiff was also becoming increasingly forgetful, nervous, and anxious.  Depression sometimes led to suicidal thoughts causing him to take his prescribed medications,

occurrences his doctor had been made aware of.  (Tr. pp. 70-78).

Dr. Crystal Younger, a VE, was the next witness to take the stand.  She began by classifying the exertional and skill demands of plaintiff's past job as a line installer as heavy, skilled work and his past job as a customer complaint clerk as involving sedentary, skilled work.  The ALJ then posed a hypothetical question to Dr. Younger which assumed an individual of plaintiff's age, education, and past work experience who could occasionally lift twenty pounds and could frequently lift ten pounds; who could stand, walk, and/or sit for six hours per eight-hour work day; and, who could never climb ladders, ropes, or scaffolds and could perform no overhead reaching.  With that profile in mind, the VE testified that the individual described in the hypothetical question would be unable to perform plaintiff's past work as a line installer but could function in the trouble resolution job. Limited contact with others would apparently have little effect on the described individual's ability to perform the trouble resolution job.  (Tr. pp. 78-81).

Upon being tendered to his attorney for further questioning, the VE admitted that dealing with the public at large or having more than seldom contact with co-workers might render the trouble resolution job unperformable.  To the first hypothetical question that had been framed by the ALJ, counsel added extreme limitations

in the ability to make simple work-related decisions, a marked impairment in the ability to respond appropriately to work pressures in a usual work setting, and a marked impairment in the ability to respond appropriately to changes in a routine work setting.  With those added limitations in mind, the VE testified that the described individual would be unable to perform plaintiff's past work.  Similarly, if the individual had to lie down for a couple of hours per day, three days per week, the identified job could not be performed.  Only occasional use of the hands would also eliminate the identified sedentary work.  (Tr. pp. 81-83).

Plaintiff challenges the Commissioner's decision to deny him DIB on three grounds. In the first of those, plaintiff argues that the ALJ erred in finding that his cervical impairments were not of Listing-level severity.  Plaintiff argues that although the ALJ found that his impairments failed to meet the criteria of any of those set forth under Section 1.00 of the Listing of Impairments, the ALJ failed to specifically discuss the requirements of any of those listings and that his condition did, in fact, satisfy the criteria of Listing 1.04(A).

In her written decisions of August 25, 2011, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date of March 29, 2010 and that he suffered

from severe impairments in the form of disorders of the cervical and lumbar spine and degenerative joint disease of the knee. (Tr. p. 27). Proceeding to step three of the §404.1520 sequential analysis, the ALJ then considered whether plaintiff had an impairment or combination thereof that met or medically equaled one of those set forth in the Listing of Impairments, 20 C.F.R. Part 404, Subpt. P, App. 1, initially stating as follows:

> [i]n accordance with *Audler v. Astrue*, 501 F.3d 446 (5th Cir. 2007), the undersigned has considered the impairments listed in Appendix 1 to Subpart P of Part 404 of the Regulations and finds that the claimant's impairments do not singularly or in combination meet or medically equal the required criteria for ... any listed impairment <u>including impairments listed under section 1.00</u> and 12.00. Despite the claimant's impairments, the medical evidence does not document listing-level severity, and no acceptable medical source has mentioned findings equivalent to the criteria of any listed impairment, individually or in combination.

> (Tr. p. 28)(emphasis added).

Only after making an assessment of plaintiff's residual functional capacity ("RFC") did the ALJ discuss the evidence pertaining to plaintiff's musculoskeletal condition. (Tr. pp. 29-32).

In *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007), the Fifth Circuit found that an ALJ's failure to identify the listing for which the claimant's symptoms failed to qualify or to provide any explanation as to how she made that determination constituted

24

error as "... '[s]uch a bare conclusion is beyond meaningful judicial review.'" *Id*. (quoting *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) (footnote omitted)). Although an ALJ is not always required to do an exhaustive point-by-point discussion of the evidence, his or her decision must be susceptible of thoughtful court scrutiny. *Id*. However, even where a step three violation has occurred, such must be subjected to a harmless error analysis to determine whether the substantial rights of a party have been affected. *Id*. (quoting *Mays*, 837 F.2d at 1364). That showing typically requires a claimant to demonstrate that his impairment satisfies the criteria of a particular listing. *Id*. at 448-49; *Hermosillo v. Astrue*, No. 10-CV-0198, 2011 WL 4528206 at *4-5 (N.D. Tex. Sept. 12, 2011), *adopted*, 2011 WL 4528374 (N.D. Tex. Sept. 30, 2011); *Moore v. Astrue*, No. 07-CV-0422, 2008 WL 4602732 at *2 (N.D. Tex. Aug. 13, 2008.

Section 1.04(A) of the Listing of Impairments provides that an individual will be deemed disabled if he suffers from:

> 1.04 *Disorders of the spine* (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

> A. Evidence of nerve room compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle

25

weakness) accompanied by sensory or reflex loss
and, if there is involvement of the lower back,
positive straight-leg raising test (sitting and
spine).

As this is a third-step inquiry under §404.1520, it is the
claimant who bears the burden of proving that his impairment or
combination of impairments meets or equals a listing. *Crowley v.
Apfel*, 197 F.3d 194, 198 (5th Cir. 1999).  "For a claimant to show
that his impairment matches a listing, it must meet <u>all</u> of the
specified medical criteria.  An impairment that manifests only some
of those criteria, no matter how severely, does not qualify."
*Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 891
(1990)(footnote omitted).

Unlike the precise factual scenario that was presented in
*Audler* in which the ALJ failed to identify the specific listed
impairment or even group of impairments for which plaintiff's
symptoms failed to qualify, the ALJ in the instant case at least
indicated that plaintiff's impairments were being measured against
those set forth "... under [S]ection 1.00 ..." relative to
disorders of the musculoskeletal system, of which there are seven
categories of impairments including Section 1.04 pertaining to
disorders of the spine.  (Tr. p. 28).  Of those seven, several
categories can easily be excluded as pertaining to plaintiff
including Section 1.03 ("<u>Reconstructive surgery or surgical</u>

26

arthrodesis of a major weight-bearing joint, ..."), Section 1.05 ("Amputation (due to any cause")), Section 1.06 ("Fracture of the femur, tibia, pelvis, or one or more of the tarsal bones"), Section 1.07 ("Fracture of an upper extremity ..."), and Section 1.08 ("Soft tissue injury (e.g. burns) ..."). That leaves only two listings, Sections 1.02 ("Major dysfunction of a joint(s) (due to any cause) ...") and Section 1.04 ("Disorders of the spine ...") as the Listings against which plaintiff's impairments could properly be measured.[2] While the ALJ's step-three conclusions were perhaps somewhat sparse, they are not "beyond meaningful judicial review" as were the findings at issue in *Audler*. In any event, because the ALJ proceeded past step three of the §404.1520 sequential analysis, an argument could be made that she implicitly found that plaintiff's impairments did not satisfy the criteria of Section 1.04(A) or any other listing for that matter. *Hernandez v. Heckler*, 704 F.2d 857, 860 (5th Cir. 1983); *Moore*, 2008 WL 4602732 at *2 n.5.

Although it may have been preferable for the ALJ to have discussed the evidence that she considered immediately following her step-three finding, that finding is nonetheless susceptible of

---

[2] Although Section 1.02 was identified as the listing that was considered by the Commissioner at the initial level of the administrative review process (Tr. p. 89), the Court harbors some doubt as to whether that Listing would apply as it describes an impairment that is "[c]haracterized by gross anatomical deformity ..."

thoughtful scrutiny by a reviewing court.  *Audler*, 501 F.3d at 448.
Regardless, under *Audler*, remand is appropriate only if plaintiff
demonstrates that he meets the requirements of Section 1.04(A).
*Id*.  Among the conditions that were alleged by plaintiff to be
disabling in his application for DIB and related paperwork were two
ruptured/bulging discs in the lower back.   (Tr. p. 164).  In terms
of medical evidence, plaintiff was seen by Dr. Butler on October 7,
2009 for reassessment of his back and knee pain and low back pain
was   one   of   the   enumerated   complaints   when   plaintiff   was
consultatively evaluated by Dr. Rabito on September 21, 2010.  Dr.
Denney included back pain in his Axis III diagnosis on January 13,
2011 and in his Medical Source Statement of March 10, 2011, he
opined   that   lifting/carrying   would   intensify   the   pain   in
plaintiff's   neck   and   back.     At   the   administrative   hearing,
plaintiff testified that he continued to suffer from back pain when
he was working in 2009 and he experienced back pain as the hearing
itself was in progress.  (Tr. pp. 56-47, 61).  Given that lower
back involvement, Section 1.04(A) mandated that plaintiff present
evidence of positive straight leg findings in both the sitting and
supine positions.  Without those required showings, plaintiff has
not demonstrated that his substantial rights have been affected and
any error on the part of the ALJ at step three of the §404.1520
analysis was harmless.  *Smith v. Astrue*, 914 F.Supp.2d 764, 785

(E.D. La. 2012).

Plaintiff's second challenge to the Commissioner's decision is that the ALJ erred in finding that his mental impairments were not severe.

In addressing this challenge, the Court first observes that plaintiff did not identify any non-exertional impairments as disabling conditions in his application for DIB or related paperwork. *Pierre v. Sullivan*, 884 F.2d 799, 802 (5th Cir. 1989. Be that as it may, in her written decision of August 25, 2011, the ALJ found that plaintiff suffered from severe impairments within the meaning of *Stone v. Hecker*, 752 F.2d 1099 (5th Cir. 1985) in the form of disorders of the cervical and lumbar spine and degenerative joint disease of the knees. (Tr. p. 27). However, as respects plaintiff's medically determinable mental impairments of affective disorder and anxiety-related disorder, the ALJ found that they did not cause more than minimal limitations in his ability to perform basic mental work activities and were, therefore, not severe. (*Id.*). In making this determination, the ALJ considered the four broad functional areas set forth in 20 C.F.R. §404.1520a(d)(1) and in Section 12.00(C) of the Listing of Impairments, namely, activities of daily living; social functioning; concentration persistence, or pace; and, episodes of decompensation. (Tr. pp. 27-28). Citing a range of activities and abilities that plaintiff

29

admitted that he was capable of, proper consideration in the Social Security context, *Anderson v. Sullivan*, 887 F.2d 630, 632 (5th Cir. 1989), and limited treatment for mental impairments during the relevant time period, the ALJ concluded that plaintiff suffered from only mild limitations in the first three functional areas and had experienced no episodes of decompensation of extended duration. (Tr. p. 28). Having so concluded, §404.1520a(d)(1) directed a finding that plaintiff's non-exertional impairments were not severe, impairments that significantly affected his ability to engage in work-related activities.  20 C.F.R. §404.1521.

In terms of the limited nature of mental health treatment, the ALJ was imminently correct as plaintiff was seen only twice by Dr. Denney during the relevant time period.  On January 13, 2011, plaintiff was seen by Dr. Denney for the first time since November 30, 2007.  Yet he was apparently able to work up until March 28, 2010 in spite of his psychological issues. *Vaughn v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995)(citing *Fraga*, 810 F.2d at 1305 n. 11) (ability to work despite pre-existing condition supports ALJ's finding of "not disabled")).  The diagnosis was generalized anxiety disorder and plaintiff was maintained on Serzone and Valium.  At plaintiff's next visit with Dr. Denney on February 10, 2011, he was described as irritable and feeling adrift but his affect was normal and his thoughts were goal-directed.  Plaintiff was continued on

his medication regime and no limitations were placed on his activities, another proper consideration. *Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995); *Vaughn*, 58 F.3d at 131.  Although Dr. Denney subsequently completed a "Medical Source Statement" on March 10, 2011 which contained a number of non-exertional limitations, it was unaccompanied by any contemporaneously-recorded, medically acceptable findings and is thus entitled to diminished weight. *Warncke v. Harris*, 619 F.2d 412, 417 (5th Cir. 1980).  More importantly, however, inasmuch as plaintiff's application for DIB proceeded past step two of the §404.1520 sequential analysis and was not summarily denied at that step based on the fact that he did not suffer from a severe impairment, plaintiff's third challenge provides no basis for disturbing the Commissioner's decision. *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987); *Chaparro v. Bowen*, 815 F.2d 1008, 1011 (5th Cir. 1987); *Wagner v. Astrue*, No. 08-CV-0519, 2010 WL 546739 at *7 (E.D. La. Feb. 12, 2010).

In his third and final challenge to the Commissioner's decision, plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence in that it includes no mental limitations, contrary to the ALJ's findings at step two that he suffered from mild limitations in the first three functional areas set forth in §404.1520a(d)(1) and Section 12.00(C).  As Social Security Ruling ("SSR") 96-8p makes clear, however, the four broad

functional areas set forth in §404.1520a(d)(1) and Section 12.00(C), *i.e.*, activities of daily living, social functioning, concentration/persistence/pace, and episodes of decompensation "... are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-8p, 1996 WL 374184 at *4. Use of the findings from the special technique used to evaluate the severity of a claimant's mental impairments in assessing a claimant's RFC is thus neither required nor appropriate.

Under the rubric of his third challenge, plaintiff also argues that the ALJ's RFC assessment does not include any limitations regarding his ability to use his arms, hands, or lower extremities. Plaintiff points to the medical opinions expressed by consultative evaluator Dr. Rabito as an RFC assessment that the ALJ was bound to accept. This argument fails for a number of reasons. Having properly found that plaintiff's impairments failed to satisfy the criteria of any of those set forth in the Listing of Impairments, the Regulations mandated that the ALJ make an assessment of plaintiff's RFC which is defined as what a claimant can still do in spite of his limitations. 20 C.F.R. § §404.1520(e), 404.1545. Just like the ultimate decision of whether or not a claimant is disabled, the responsibility for determining an individual's RFC at the hearing level lies with the ALJ. 20 C.F.R. § §404.1527(e)(1),

404.1546(c).  Medical opinions like those expressed by Dr. Rabito are not an RFC assessment at all.  *Joseph-Jack v. Barnhart*, 80 Fed. Appx. 317, 318 (5th Cir. 2003).

The foregoing notwithstanding, the Court recalls that when plaintiff was evaluated by Dr. Rabito, there was no gross joint deformity, heat, or effusion present in either knee.  Flexion of the knees was full and straight leg raising to 80 degrees produced no radicular pain.  Muscle tone, development, range of motion and strength in the upper extremities was normal, there was no atrophy or fasciculations, and hand grip was firm bilaterally.  Plaintiff's back had a normal lordotic curve with no significant scoliosis, flexion was possible to 90 degrees with no pain, there was no evidence of sciatica, and plaintiff was able to heel-to-toe walk. The doctor's physical examination was essentially within normal limits with no significant motor, gait, or abnormal clinical neurologic findings.  In light of those largely unremarkable findings, Dr. Rabito opined that plaintiff was capable of normal ambulatory activity that did not require long periods of strenuous and repetitive use of the arms, hands, and lower extremities.

In her written opinion, the ALJ assessed plaintiff as having an RFC for light work that was further limited by no climbing of ladders, ropes, or scaffolds and no overhead reaching.  After discussing the medical and testimonial evidence before her, the ALJ

concluded as follows:

> [i]n summary, the medical evidence supports the
> existence of severe musculoskeletal impairments
> that cause some functional restrictions. However,
> the claimant has full range of motion of his joints
> and improvement in his symptoms with steroid
> injections. He is able to engage in activities
> that require pushing, pulling, bending, standing,
> walking and sitting, as indicated by his performing
> of household chores. He testified that some
> strenuous activities would cause pain for which he
> needs to rest and use of a heating pad.
> Nevertheless, his activities are continuous, as
> these include his normal daily chores.
> Consequently, the impairments singularly or in
> combination do not restrict the claimant from
> performing such activity as indicated in the
> established functional assessment.

(Tr. p. 32).

While Dr. Rabito felt that plaintiff was precluded from
performing work that required long periods of strenuous and
repetitive use of the arms, hands, and lower extremities but
otherwise involved normal ambulatory activity, the ALJ assessed
plaintiff as being capable of a range of light work that was
further limited by no climbing of ladders, ropes, and scaffolds and
no overhead reaching. Light work is defined as that which involves
lifting no more than twenty pounds at a time and frequent lifting
or carrying of objects weighing up to ten pounds. The RFC that was
arrived at by the ALJ not only contained restrictions related to
the use of plaintiff's arms, hands, and lower extremities, it
adequately accounted for the limitations noted by Dr. Rabito and

was actually more restrictive than what the doctor had opined. Given the body of the evidence that was before him, the ALJ's RFC assessment was a correct one.

## RECOMMENDATION

In the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except on grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Services Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996)(*en banc*).

New Orleans, Louisiana, this __8th__ day of _____April_____, 2014.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE